**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE:<br><br>Rodney Richard Richburg, Sr. and<br>Pamela M Tisdale-Richburg,<br><br>Debtor(s). | C/A No. 25-01297-EG<br><br>Chapter 13<br><br>**ORDER OVERRULING**<br>**DEBTORS' OBJECTION TO CLAIM**<br>**OF NAVY FEDERAL CREDIT UNION** |

Rodney Richard Richburg, Sr. and Pamela M Tisdale-Richburg ("Debtors") object to the claim filed by Navy Federal Credit Union ("Navy FCU")[1] for Debtors' outstanding mortgage debt in their chapter 13 case ("Claim Objection"),[2] asserting that Navy FCU has overstated its claim by including $10,687.43 in projected "fees" for a "prepetition escrow projected 'arrearage'" and requesting that such claim be reduced to $3,639.18. Navy FCU responded to Debtors' Claim Objection, maintaining that the prepetition arrearage amount set forth in its Proof of Claim is accurate and properly includes the projected escrow shortage calculated as of the date the case was filed; accordingly, Navy FCU argues that Debtors' request to reduce its claim should be denied.[3] The parties filed a Joint Statement of Dispute setting forth their respective positions on the issues presented.[4]

The Court held a hearing on the Claim Objection on August 12, 2025, which was attended by Debtors' counsel, Mr. Richburg, and counsel for Navy FCU. Navy FCU presented Escrow Analysis Statements from 2022 through 2025 ("Exhibit A") and a copy of the COVID-19 loan modification agreement executed by the parties on September 20, 2022 ("Exhibit B"). Debtor

---

[1] Proof of Claim No. 3-1, filed Apr. 25, 2025.
[2] ECF No. 16, filed June 14, 2025.
[3] ECF No. 22, filed June 16, 2025.
[4] ECF No. 46, filed Aug. 6, 2025.

1

offered no documents into evidence, relying solely upon the proof of claim filed by Navy FCU. No witness testimony or applicable case law were presented by either party. At the conclusion of the hearing, the Court took the matter under advisement.

## FINDINGS OF FACT

I.   Background

On July 16, 2018, Debtors financed the purchase of real property at 2870 Porcher Drive, in Sumter, South Carolina (the "Property") with a loan from Navy FCU, and executed a promissory note in the amount of $569,800.00, secured by a mortgage on the Property (the "Mortgage").[5] In addition to requiring Debtors to make monthly payments of principal and interest to Navy FCU, the Mortgage requires Debtors to pay additional monthly amounts to Navy FCU for taxes and hazard insurance, which are held in an escrow account until those funds are disbursed to the appropriate tax entity or insurer when due. Specifically, Part 3 of the Mortgage provides that:

> [T]he Borrower [Debtors] shall pay to Lender [Navy FCU] . . . a sum (the 'Funds') to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Interest as a lien or encumbrance on the Property; . . . [and] (c) premiums for any and all insurance required by Lender . . . .

It further provides that:

> Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under [the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*], and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

---

[5] Copies of the promissory note and Mortgage agreement were filed as attachments to Navy FCU's proof of claim. Though the claim was not introduced into evidence at the hearing, Debtors' Claim Objection does not raise any issues with respect to the authenticity of those documents.

2

If there is a shortage of Funds held in escrow, as defined under RESPA, the Mortgage requires Lender to notify Borrower, and Borrower must pay to Lender the amount necessary to make up the shortage in accordance with RESPA.[6]

In September 2022, Debtors and Navy FCU executed a COVID-19 Loan Modification Agreement (Providing for Fixed Interest Rate), wherein the parties agreed that the unpaid principal balance under the Note and Mortgage as of November 1, 2022 was $561,670.40, and the interest rate was modified to a fixed rate of 6.125%, with monthly payments due of $3,412.77 (principal and interest only).[7] Shortly thereafter, on September 26, 2022, Navy FCU sent Debtors an annual escrow analysis statement showing an escrow shortage of $6,243.62, which was due to be paid over the next 60 months, and notifying Debtors that they were required to increase the escrow account balance by making additional "escrow increase" payments of $104.06 per month, increasing their total monthly mortgage payment to $4,765.57, beginning November 1, 2022.[8] Counsel for Navy FCU explained at the Claim Objection hearing that it is the lender's policy with COVID-19 loan modifications to spread escrow shortage repayment over 60 months, rather than the minimum 12-month period required by Regulation X.

Navy FCU sent a second annual escrow analysis statement to Debtors on March 13, 2023, indicating an escrow shortage of $5,678.95, which was due to be paid over the next 55 months,

---

[6] The Mortgage also provides that "[i]f there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in *no more* than 12 monthly payments." Proof of Claim No. 3-1, at 16 (emphasis added). Regulation X, which supplements RESPA, however, provides that the shortage must be repaid over *at least* a 12-month period. 12 C.F.R. § 1024.17(f)(3)(ii). The Court notes that it would be to Debtors' benefit to repay the shortage over a lengthier period, as Navy FCU has allowed Debtors to do in this case.
[7] Ex. B.
[8] Ex. A, at 1-3.

3

and changing the required "escrow increase" payments to $103.25 per month thereby decreasing their total monthly payment to $4,760.32 as of April 1, 2023.[9]

On March 15, 2024, Navy FCU sent a third annual escrow analysis statement to Debtors, showing an escrow shortage of $9,265.22, which was due to be paid over the next 42 months by making "escrow increase" payments of $220.60 per month, increasing their total monthly payment to $4,969.26 as of May 1, 2024.[10]

On June 5, 2024, Debtors and Navy FCU executed a Mortgage Deferral Agreement,[11] wherein the parties agreed that as of June 5, 2024, the amount past due on the loan principal was $15,794.07 and that "the time for repayment of said amount shall be extended and deferred until the final payment due under the terms of the Security Instrument." In paragraph 3 of the Mortgage Deferral Agreement, the parties acknowledged that an analysis of the escrow account would be completed concurrently with or soon after the execution of the Deferral Agreement, and "[t]he Mortgagor(s) [Debtors] agree(s) that after this Agreement is executed the loan payment may increase as a result of the escrow analysis, and further that the escrow payment will be adjusted to bring the escrow account current in order to avoid significant changes in the future monthly payments."

On July 1, 2024, in accordance with the Mortgage Deferral Agreement, Navy FCU sent a fourth annual escrow analysis statement to Debtors, showing an escrow shortage of $13,270.41, which was due to be paid over the next 38 months, and notifying Debtors that they would be

---

[9] Ex. A, at 4-6. The total monthly payment decreased from $4,765.57 to $4,760.32 beginning April 1. 2023. In addition to the reduction in the "escrow increase" payment, the amount of the ongoing escrow payment decreased to $1,244.30.

[10] Ex. A, 7-9. The total monthly payment increased from $4,760.32 to $4,969.26 as of May 1, 2024. In addition to the change in the amount of the "escrow increase," the ongoing escrow payment amount increased to $1,335.89.

[11] Proof of Claim No. 3-1, at 29.

4

required to make "escrow increase" payments of $349.22 per month, increasing their total monthly payment to $5,134.21 as of September 1, 2024.[12]

On March 14, 2025, Navy FCU sent a fifth annual escrow analysis statement to Debtors, showing an escrow shortage of $11,018.30, which was due to be paid over the next 30 months, and notifying Debtors that their new "escrow increase" payments would be $367.28 per month, increasing their total monthly payment to $5,201.52 as of May 1, 2025.[13]

II.     Debtors' Bankruptcy Case

Debtors filed a chapter 13 voluntary petition (the "Petition"), schedules, and statements on April 6, 2025 (the "Petition Date"). On Schedule A/B, Debtors listed ownership of the Property, in addition to several other real estate properties. On Schedule D, Debtors listed Navy FCU as holding a claim in the amount of $565,100.00, secured by the Mortgage.

On April 25, 2025, Navy FCU filed a proof of claim (the "POC"), asserting a claim for $558,115.13. The POC includes the following attachments: (1) Mortgage Proof of Claim Attachment, (2) Note dated July 16, 2018, (3) Mortgage dated July 16, 2018 and recorded July 17, 2018, (4) Mortgage Deferral Agreement dated June 5, 2024; and (5) Annual Escrow Analysis Disclosure Statement dated April 10, 2025 (the "2025 Escrow Analysis").

On the Mortgage Proof of Claim Attachment, in Part 3: Arrearage as of Date of the Petition, Navy FCU indicated that there is an escrow deficiency for funds advanced of $2,052.21, projected escrow shortage of $10,687.53, and prepetition fees of $1,586.97, for a total prepetition arrearage of $14,326.71. This arrearage does not include any amounts due for principal or interest, as the

---

[12] Ex. A, 10-12. The total monthly payment increased from $4,969.26 to $5,134.21 as of September 1, 2024. While the "escrow increase" payment increased, the ongoing escrow payment amount decreased to $1,372.22.
[13] Ex. A, 13-15. The total monthly payment increased from $5,134.21 to $5,201.52 as of May 1, 2025. While the escrow increase payment increased, the ongoing escrow payment amount decreased to $1,421.47.

5

payment history attached to the POC reflects that Debtors had not missed any monthly mortgage payments in the months leading up to the bankruptcy filing.

The 2025 Escrow Analysis attached to the POC reflects that Navy FCU conducted an escrow analysis six days after the Petition Date—on April 10, 2025. According to the 2025 Escrow Analysis, Navy FCU anticipates making two disbursements over the 12 months following the date of the analysis for hazard insurance in July of 2025 in the amount $12,109.00 and county taxes in December of 2025 in the amount of $4,948.62, for a total of $17,057.62. The escrow account history in Item 3 of the 2025 Escrow Analysis reflects a negative balance in the escrow account of -$2,052.21 as of March 2025, which is also reflected in Part 3 of the Mortgage Proof of Claim Attachment as the "Escrow deficiency for funds advanced." The 2025 Escrow Analysis further indicates that an escrow balance of $10,687.53 is required as of April 1, 2025, which is the same amount listed for the "Projected escrow shortage" in Part 3 of the Mortgage Proof of Claim Attachment.

## DISCUSSION AND CONCLUSIONS OF LAW

Debtors assert that Navy FCU has overstated the amount of its claim. Specifically, Debtors object to the total prepetition arrearage stated in the POC, asserting that the projected escrow shortage is not supported by the documentation attached to the POC. "The Bankruptcy Code imposes a burden shifting framework for proving the amount and validity of a claim." *In re Muffin Mam, Inc.,* 670 B.R. 593, 599 (Bankr. D.S.C. 2025). As the objecting party, Debtors bear the initial burden of producing evidence sufficient to negate the *prima facie* validity of the filed claim. *In re Field,* 604 B.R. 680, 684 (Bankr. D.S.C. 2019) (citing *In re Washington,* 581 B.R. 150 (Bankr. D.S.C. 2017) (citing *In re Harford Sands, Inc.,* 372 F.3d 637, 640 (4th Cir. 2004)). "Such evidence 'must be sufficient to demonstrate the existence of a *true dispute* and must have probative

6

force equal to the contents of the claim.' " *Muffin Mam,* 670 B.R. at 599 (quoting *Meral, Inc. v. Xinergy, Ltd.,* No. 7:16CV00059, 2016 WL 7235846, at *3 (W.D. Va. Dec. 13, 2016)) (emphasis in original).  Once Debtors meet their burden, "the burden then shifts back to the creditor, who must prove by a preponderance of the evidence the amount and validity of the claim." *Muffin Mam,* 670 B.R. at 599 (quoting *Summit Cmty. Bank v. David,* 629 B.R. 804, 809 (E.D. Va. 2021)).

A properly filed proof of claim has *prima facie* validity.  Fed. R. Bankr. P. 3001(f).  This Court has summarized the requirements of Fed. R. Bankr. P. 3001 for obtaining *prima facie* validity as follows:

> The proof of claim must conform substantially to Official Form 410 and must contain certain supporting information set forth in Rule 3001(c), including, among other requirements: (1) a claim based on a writing must attach a copy of that writing; (2) if the claim includes pre-petition interest, fees, expenses, or other charges, an itemized statement of those charges must be filed; (3) if a security interest is claimed, evidence that the security interest has been perfected.

*In re Gardner,* No. 22-02007-eg, 2022 WL 16952440 (Bankr. D.S.C. Nov. 15, 2022) (citing Fed. R. Bankr. P. 3001(a), (c), and (d), and *In re Sherman,* 639 B.R. 618, 622 (Bankr. D.N.M. 2022)). Applying this standard, the record reflects that Navy FCU's claim meets the requirements for *prima facie* validity under Rule 3001.  Navy FCU's POC includes (a) a copy of the Note and Mortgage upon which its claim is based, (b) an itemized statement of prepetition interest, fees, expenses, or other charges, and (c) evidence that its security interest has been perfected via indication on the face of the Mortgage that it was properly recorded with the Register of Deeds for Sumter County.

After the initial determination is made that a proof of claim has been signed and filed in accordance with the Federal Rules of Bankruptcy Procedure and thus has *prima facie* validity, the burden shifts to the debtor to object to the claim.  *Muffin Mam,* 670 B.R. at 599.  Here, Debtors contend they should only be required to pay the escrow deficiency for funds advanced and the

7

prepetition fees included in Part 3 of the Mortgage Proof of Claim Attachment for a total prepetition arrearage of $3,639.18.[14] In the Joint Statement of Dispute, Debtors cite RESPA and 12 C.F.R. § 1024.1 (Regulation X) as the governing authorities for this dispute.

At the hearing, Debtors' counsel presented a convoluted explanation of why Debtors believe the projected escrow shortage is inaccurately reflected in the POC. The Claim Objection and Joint Statement of Dispute do not provide any further clarity. Based on the Court's understanding, Debtors argue that "it is not clear that [Navy FCU] is not charging for superfluous coverage," and further posit that the prepetition arrearage for escrow shortage was in essence caused by Navy FCU arbitrarily and prematurely terminating their own prepetition escrow recoupment plan. Finally, without citing to any authority other than general references to RESPA, Debtors appear to argue that Navy FCU should not be allowed to include the projected escrow shortage in its proof of claim because Debtors were already paying towards this prepetition escrow shortage for seven to eight months prior to the Petition Date. More specifically, Debtors appear to argue that there is an escrow shortage because Navy FCU lowered the monthly escrow payment by approximately $300.00 at the time of the filing of the bankruptcy case. In so doing, from what the Court can decipher, Debtors assert, without advancing any concrete evidence or pointing to specific inaccuracies in the calculations in the POC attachments, that there would be an escrow surplus if Navy FCU had not lowered that payment.

---

[14] In Debtors' latest chapter 13 plan, filed on August 7, 2025 (ECF No. 50), Debtors propose to pay Navy FCU an arrearage of $5,178, which the plan indicates includes prepetition escrow arrears and attorney fees. When questioned by the Court regarding the discrepancy between this amount and the amount asserted in the Objection, Debtors' counsel indicated that it was the escrow arrearage plus the fees Navy FCU was seeking. Navy FCU filed a Notice of Postpetition Mortgage Fees, Expenses and Charges on May 16, 2025, asserting a supplemental claim of $1,450. This amount, plus the $3,639.18 in escrow deficiency and prepetition fees, equals $5,089.18—not $5,178. Thus, it is unclear how Debtors calculated the amount proposed to be paid to Navy FCU in their proposed plan and why the post-petition fees would be included as part of the prepetition arrearage.

Based on the evidence before the Court, the arguments presented by the parties, and its review of RESPA and other applicable authorities, the Court has not been able to detect any inaccuracies in the figures presented in Navy FCU's POC. Under the terms of Debtors' Mortgage with Navy FCU, Debtors are required to pay additional monthly amounts to Navy FCU for the payment of taxes and hazard insurance in addition to their monthly payments of principal and interest. These payments for taxes and insurance are held in an escrow account until those funds are disbursed to the appropriate tax entity or insurer when due. Under Regulation X, an "[e]scrow account means any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums . . . , or other charges with respect to a federally related mortgage loan . . . ." 12 C.F.R. § 1024.17. RESPA governs the amounts that a lender or servicer[15] can require a homeowner to pay into an escrow account. *In re Davis-Peters,* 669 B.R. 308, 313 (Bankr. N.D. Ill. 2025). RESPA allows a lender or servicer to estimate how much it will be required to disburse for taxes and insurance in the upcoming year to determine the estimated total escrow funds needed for the year and add to this estimate an allowed "cushion" of up to two months of escrow payments. *Id.* at 314; 12 C.F.R. § 1024.17(c). The final amount is divided by twelve to determine the homeowner's monthly escrow payments for the coming year. *Id.* This computation is part of the accounting a servicer conducts called an "escrow account analysis," which allows the servicer to determine the appropriate target balances for the escrow account and determine whether shortages, surpluses, or deficiencies exist in the account. *Id.* The "target balance" is "the estimated month end balance in an escrow account that is just sufficient to cover the remaining disbursements from the escrow account in the escrow account computation year, taking into account the remaining

---

[15] RESPA defines a "servicer" as any person "receiving any scheduled payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(2)-(3).

scheduled periodic payments, and a cushion, if any." 12 C.F.R. § 1024.17(b). An escrow account shortage occurs when a "current account balance falls short of the target balance at the time of the escrow analysis." 12 C.F.R. § 1024.17(b). An escrow account "shortage" is different from an escrow account "deficiency," which is "the amount of a negative balance in an escrow account." *Id.*; *Davis-Peters*, 669 B.R. at 318.

Navy FCU conducted an escrow account analysis regarding Debtors' account on several occasions—the most recent of which was completed shortly after the Petition was filed commencing this case. As reflected through the figures set forth in the April 2025 Escrow Analysis attached to the POC, Navy FCU anticipated making a disbursement of $12,109.00 for hazard insurance in July of 2025 and $4,948.62 for taxes in December of 2025, making the total expected disbursements from the escrow account for the calculation year $17,057.62. The scheduled escrow deposits for the 12 months included in the calculation year are shown as $1,421.47 per month, making the total to be deposited into the account for the year $17,057.64. Though the total deposits roughly equal the total expected disbursements, the timing of those deposits and disbursements creates the projected account shortage. The 2025 Escrow Analysis shows that by July of 2025, there will not have been enough funds deposited yet to cover the full hazard insurance disbursement and still maintain the contractual minimum balance for the account, which is two months' worth of escrow payments ($2,842.94)—the amount allowed to be maintained as a cushion in the account under RESPA. Accordingly, after the hazard insurance disbursement is made, the escrow account balance is projected to be -$8,175.36, meaning there would be a deficiency of $8,175.36 in July of 2025. The target balance for that month is shown to be $2,842.94—the minimum balance needed to maintain the contractual cushion. The target balance

10

as of the Petition Date ($10,687.53)[16] reflects the amount the account should have at that time to make sure that, after adding the deposits scheduled to be made by July of 2025, the account would have enough funds to maintain the contractual cushion even after the hazard insurance disbursement is made. Because Official Form 410A requires escrow account servicers to perform the escrow analysis "as of the date the petition was filed," the right to payment for the projected shortage arises when the petition is filed and is thus considered a prepetition claim. *Davis-Peters,* 669 B.R. at 315. Moreover, the Form Instructions for Official Form 410A define "projected escrow shortage" as "the amount the claimant asserts should exist in the escrow account as of the petition date, less the amount actually held," and allows the claimant to include a cushion in accordance with RESPA and Reg. X.[17] Accordingly, Navy FCU conducted the April 2025 Escrow Analysis and projected an escrow shortage of $10,687.53 as of the Petition Date, which was thus due at that time, making the escrow shortage part of the pre-petition arrearage.

Contrary to Debtors' assertion that the shortage was caused by Navy FCU arbitrarily and prematurely terminating their own prepetition escrow recoupment plan, the shortage as of the Petition Date appears to be caused by prior escrow account shortages that have not yet been repaid. Navy FCU presented into evidence the Escrow Account Analyses it conducted on September 26, 2022, March 13, 2023, March 15, 2024, July 1, 2024, and March 14, 2025. The Escrow Account Analyses each show the escrow account shortage as of the date of the analysis, and provide the amount of the monthly escrow increase payment required to repay the projected shortage over a specified time period as follows:[18]

---

[16] As indicated in Item 4 on the April 2025 Escrow Analysis, the escrow account had a beginning balance of -$330.77, which was reduced to zero in the calculation of the required projected escrow balance of $10,687.53. This accounts for the difference between the amounts shown for July of 2025 of -$8,175.36 and $2,842.95—which is $11,018.30—being slightly higher than the projected escrow balance of $10,687.53.

[17] Official Form 410A, Form Instructions, https://www.uscourts.gov/forms-rules/proof-claim-attachment-a-0.

[18] Overall, the Escrow Account Analyses reflect that there has been a consistent escrow shortage every year that was never fully repaid because the payments were stretched out. In the Joint Statement of Dispute, Navy FCU stated that

| Date of Escrow Analysis | Escrow Shortage | Escrow Increase Payment | Repayment Period |
|---|---|---|---|
| September 26, 2022 | $6,243.62 | $104.06 | 60 months |
| March 13, 2023 | $5,678.95 | $103.23 | 55 months |
| March 15, 2024 | $9,265.22 | $220.60 | 42 months |
| July 1, 2024 | $13,270.41 | $349.22 | 38 months |
| March 14, 2025 | $11,018.30 | $367.28 | 30 months |

Debtors also seemed to argue that the projected escrow shortage should not count towards prepetition arrears, as the shortage would occur post-petition. However, courts that have addressed the issue have determined that projected escrow shortage should be included in prepetition arrears based on when the right to payment arises. Interpreting the language in RESPA and Regulation X, the court in *In re Davis-Peters* determined that "[a] servicer's 'right to payment' for an escrow account shortage . . . arises at the time a servicer conducts the escrow analysis." 669 B.R. at 315 (concluding that claims for projected escrow shortages are *prepetition* claims, even if the servicer undertakes the escrow analysis post-petition); *see also* 12 C.F.R. § 1024.17(f)(3)(ii) ("If an escrow account analysis discloses a shortage that is greater than or equal to one month's escrow account payment, . . . then the servicer may require the borrower to repay the shortage in equal monthly payments over at least a 12-month period."); *In re Rodriguez,* 629 F.3d 136 (3rd Cir. 2010) (concluding that unpaid escrow obligation was part of the creditor's prepetition claim under the terms of the mortgage); *JPMorgan Chase Bank, Nat'l Assoc. v. DeGuiseppi,* No. 1:18-cv-1457, 2019 WL 1724629, *1 (C.D. Ill. Apr. 18, 2019) (concluding that the right to payment for a

---

from March 1, 2022 to December 10, 2024, it disbursed $49,316.62 for taxes and insurance, but only received $34,108.97 from Debtors to apply to escrow.

12

projected escrow shortage accrues at the time it is calculated and therefore may be a prepetition claim).

Debtors' argument that an escrow shortage only exists because Navy FCU lowered the monthly escrow payment by approximately $300.00 at the time of the filing of the bankruptcy case lacks merit. The record reflects there is a shortage because more money should have been in the escrow account as of the Petition Date to ensure that Navy FCU had sufficient funds in the account to make the upcoming payments for hazard insurance in July 2025 and taxes in December of 2025 without having to advance funds to make those payments on behalf of Debtors or let the account balance dip below the cushion RESPA permits Navy FCU to require be maintained in the account as a contractual minimum balance. Unlike the earlier Escrow Analysis statements, the April 2025 Escrow Analysis does not include an "escrow increase" payment to recoup the shortage because the automatic stay prevents Navy FCU from collecting on the shortage as RESPA and Regulation X allow outside of bankruptcy—as equal monthly payments made over a period of 12 or more months. *Id.* at 320 (citing *In re Garcia,* 603 B.R. 640, 646 (Bankr. E.D.Cal. 2019)); *see also Campbell v. Countrywide Home Loans, Inc.,* 545 F.3d 348, 354 (5th Cir. 2008). "Instead, in chapter 13, debtors cure prepetition defaults over the life of their plans, and they must pay postpetition claims as they come due, based on the claims' underlying contract terms." *Davis-Peters,* 669 B.R. at 316 (citing 11 U.S.C. § 1322(b)(5)). Therefore, Debtors must pay the projected escrow shortage as part of the Mortgage arrearage over the course of their Chapter 13 plan.

Lastly, Debtors' position that Navy FCU should not be allowed to include prepetition escrow shortages in their proof of claim that Debtors were already paying in the months prior to the bankruptcy filing is similarly confusing and unsupported by applicable legal authority, evidence, or convincing argument that rebuts Navy FCU's explanation of how the escrow

13

shortages were calculated. "The Code and Rules make it clear that definitions from Reg. X, not the debtors' homespun explanations, govern these claims." *Id.* The POC and its supporting documentation reflect that Debtors have a projected escrow shortage as of the Petition Date, despite their previous efforts to repay earlier escrow shortages in the months leading up to the bankruptcy case. Debtors have raised several issues to dispute the amount of the projected escrow shortage reflected as part of the pre-petition arrearage but have failed to point to the Court to how the figures reflected in the POC are incorrect or misapplied. Even more importantly, they have not clearly explained or presented a convincing argument as to how Navy FCU's calculations and asserted projected escrow shortage are somehow inaccurate and do not comply with RESPA or other applicable legal authority. Said simply, aside raising "homespun explanations" and arguments, Debtors have failed to meet their burden of presenting evidence to negate the *prima facie* validity of Navy FCU's POC.

## CONCLUSION

For the foregoing reasons, Debtors' objection to claim of Navy FCU is overruled.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**08/25/2025**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 08/25/2025

14